IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALBERT DAVIS, #175 321, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:16-CV-8-GMB |
| | ) | [WO] |
| MONTGY. COUNTY DETENTION | ) | |
| FACILITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, Albert Davis, is an indigent inmate incarcerated at the Donaldson Correctional Facility in Bessemer, Alabama.[1] He brings this *pro se* 42 U.S.C. § 1983 action for injunctive relief and damages alleging Defendants acted with deliberate indifference to his safety during his incarceration at the Montgomery County Detention Facility in May 2015 by failing to protect him from an inmate assault. Davis maintains the inmate assault resulted from a lack of security at the facility and a failure to supervise and train subordinates. Davis names as defendants the Montgomery County Detention Facility, Sheriff Derrick Cunningham, Correctional Officers Latasha Campbell and Amber Fitts, and Director Wanda Robinson.[2] Docs. 1 & 38.

Defendants have filed an amended answer, special reports, a supplemental special

---

[1] The parties in this case have consented to the exercise of jurisdiction by the Magistrate Judge under 28 U.S.C. § 636(c) for all proceedings. Specifically, the parties executed a written consent form which reads, in relevant part, that in accordance with the provisions of § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case "consent to have a United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of a final judgment, and post-judgment proceedings." *See* Docs. 17 & 88.
[2] In accordance with the prior orders, opinions, and proceedings in this matter, Davis' complaint against the Montgomery County Commission and Quality Correctional Healthcare, Inc. were dismissed. Docs. 6 & 12.

report, and supporting evidentiary materials addressing Davis' claims for relief. Docs. 18, 19, 27, 28, 44, 46, 47 & 50. In these filings, Defendants deny they acted in violation of Davis' constitutional rights. Upon receipt of Defendants' special reports, the court issued an order directing Davis to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Davis that "the court may at any time thereafter and without notice to the parties (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment." Docs. 30 at 2 & 48 at 2.

Davis responded to Defendants' special reports. Docs. 37, 56, 84 & 85. Davis has not sworn to the truthfulness of the statements in his responses, however, and thus they do not meet the requirements of Federal Rule of Civil Procedure 56(e)(1) that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." This failure on Davis' part means that these responses are not evidence that could be deemed to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e)(1); *Holloman v. Jacksonville Housing Auth.*, 2007 WL 245555, *2 (11th Cir. Jan. 30, 2007) (holding that "unsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment"); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1986); *Dickinson v. Wainwright*, 626 F.2d 1184, 1185 (5th Cir. 1980). The court will treat Defendants' reports as motions for summary judgment, and resolves these motions in favor of Defendants.

## I.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment

as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322–24.

Defendants have met their evidentiary burden. Thus, the burden shifts to Davis to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery v. Sarasota White Sox, Inc*., 64 F.3d 590, 593–94 (11th Cir. 1995) (holding that, once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate there is a genuine dispute of material fact) (internal quotations omitted). This court also will consider "specific facts" pleaded in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the non-moving party produces evidence that would allow a reasonable factfinder to return a verdict

in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Educ.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

Although factual inferences must be viewed in a light most favorable to the non-moving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Davis' *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

## II. DISCUSSION

### A. The Montgomery County Detention Facility

Defendants argue that the Montgomery County Detention Facility is not a legal entity capable of being sued. Doc. 18. The court agrees.

To allege a viable § 1983 claim, a plaintiff must name as a defendant an entity subject to being sued. *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992). The capacity of a party to be sued is "determined by the law of the state in which the district court is held." *Id*. Both federal and state law are settled that a county sheriff's department is not a legal entity subject to suit or liability. *Id*.; *White v. Birchfield*, 582 So. 2d 1085, 1087 (Ala. 1991). It follows that a building or structure utilized by a sheriff's department is not a legal entity subject to suit. Accordingly, Davis' claims against the Montgomery County Detention Facility are dismissed.

### B. Official Capacity

The individual defendants assert that Davis' official-capacity claims against them are due to be dismissed based on the Eleventh Amendment to the United States

Constitution Docs. 18 & 47. The Eleventh Amendment bars suits for money damages against a state by the citizens of that state, unless the state waives its Eleventh Amendment immunity or Congress abrogates said immunity. *See Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir. 1990). Congress has not abrogated Eleventh Amendment immunity in § 1983 cases, nor has the State of Alabama consented to suit. *Id*. at 1525. Moreover, Eleventh Amendment immunity extends to state officials sued in their official capacities when "'the state is the real, substantial party in interest.'" *Id*. at 1524 (quoting *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)). Under Alabama law, because sheriffs are deemed "executive officers of the state," lawsuits against sheriffs in their official capacities are, in essence, lawsuits against the state. *Id*. at 1525 (citation omitted). Thus, the Eleventh Amendment provides absolute immunity to sheriffs sued in their official capacities. *Id.*; *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1288 (11th Cir. 1998) ("[A]n Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail."). This immunity extends to deputy sheriffs because of their "traditional function under Alabama law as the Sheriff's alter ego." *Carr*, 916 F.2d at 1527. Accordingly, the individual defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages against them in their official capacities. *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## C. Injunctive Relief

Davis is no longer incarcerated at the Montgomery County Detention Center. The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief.

*See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (holding that past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). As it is clear from the pleadings and records before the court that Davis is no longer incarcerated at the Montgomery County Detention Facility, his request for equitable relief is moot.

### D.    Qualified Immunity

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute Defendants were acting within the course and scope of their discretionary authority when the incident occurred. Davis must, therefore, allege facts that, when read in a light most favorable to him, show Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling authority is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If a plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze

the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

## E. The Complaint

On February 4, 2015, Davis was booked into the Montgomery County Detention Facility, where he was on loan from the Kilby Correctional Facility for a court appearance. In his verified complaint and amendment, Davis states he was attacked in his cell on May 14, 2015 by three unknown inmates during the facility's lockdown or "cool down" period which runs from 12:30 p.m. to 2:30 p.m. At approximately 12:50 p.m., Davis alleges that he was awakened by three unknown inmates,[3] tied up, and beaten until the cool down period ended at 2:30 p.m. Davis complains that no security check was conducted during the cool down period on the day the incident occurred even though, he claims, security checks during cool down are normal procedure to ensure the cells are locked and that only two men are in each cell. Rather, Davis contends Defendants Campbell and Fitts—who were in the "cube"—talked on their phones instead of monitoring his cell block.[4] After the cool down period ended and jailers opened the cell doors, Davis states his attackers continued to beat him. When Officer Campbell later entered the cell block to change the television channel, Davis alerted her to his plight by calling out for help. Campbell called

---

[3] In his complaint and amendment, Davis repeatedly states that he was attacked by three unknown inmates, but on one occasion he claims to have been attacked by four. Doc. 38 at 5. Although not material to resolution of the pending motions, the undisputed evidence reflects Davis was attacked by three inmates.

[4] The court directed Defendants "to file conventionally with the Clerk of Court a copy of the video recording(s) made/recorded from the control booth for the cellblock in J1 3-South as recorded on May 14, 2015, covering the relevant time period, *i.e.*, from 12:00 p.m. to 3:00 p.m." Doc. 25. The order further directed that Defendants ensure Davis had an opportunity to view a copy of the video recording(s) submitted. Doc. 25. In filing the requested video evidence, Defendants noted that the video footage runs from 12:15 p.m. to 3:15 p.m., which was the period of time saved shortly after the incident in May of 2015. Defendants further state "[t]he other footage on the day of the incident was taped over by the Detention Facility in the regular court of business shortly after this incident occurred in May of 2015." Doc. 29.

for back-up and directed the inmates to stop attacking Davis. Campbell then removed Davis from his cell and locked in his attackers. After confirming the identity of his attackers to jail officials, Davis was taken to the infirmary for a body chart and pictures. Medical personnel provided Davis with treatment for his injuries. He then returned to Kilby where he received additional medical care and treatment. Docs. 1 & 38.

## F.    Failure to Protect

A correctional official may be held liable under the Constitution for acting with deliberate indifference to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. The Eleventh Circuit has "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety.'" *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313 (11th Cir. 2005) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)). A constitutional violation occurs only when a plaintiff establishes the existence of "a substantial risk of serious harm, of which the official is subjectively aware," and that "the official does not respond[] reasonably to the risk" *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (internal quotation omitted). "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations omitted); *see also Rich v. Bruce*, 129 F.3d 336, 339–40 (4th Cir. 1997) (holding that unless a prison official actually makes the  inference that a substantial risk of serious

harm exists, he does not act with deliberate indifference even where his actions violate prison regulations or can be described as stupid or lazy).  An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991); *overruled in part on other grounds by Farmer*, 511 U.S. 825.  An "official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838.

"Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence. . . . However, in order for liability to attach, the officer must have been in a position to intervene." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)).  The plaintiff has the burden of showing that the defendant was in a position to intervene but failed to do so. *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).

Based on the foregoing, to survive summary judgment on his failure to protect claim, Davis must present "sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale*, 50 F.3d at 582.

> To be deliberately indifferent, Defendants must have been subjectively aware of the substantial risk of serious harm in order to have had a sufficiently culpable state of mind.  Even assuming the existence of a serious risk of harm and causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists— and the prison official must also draw that inference.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks and citations omitted).

Davis alleges Defendants acted with deliberate indifference to his safety on May 14, 2015 when three unknown inmates entered his cell and beat him for over one and a half hours. Although security checks are routinely conducted during the cool down period, Davis maintains no security checks took place on the day of the incident and argues this lapse in security makes Defendants liable for the inmate attack. Despite informing jail officials many times that he had enemies on the third floor of the jail, Davis complains they still placed him in that location. Docs. 1 & 38.

Defendants' evidence includes their affidavits, body charts, an incident report, video evidence, and other jail records. These documents reflect that on May 14, 2015 Defendant Campbell and Defendant Fitts—a correctional officer trainee at the time of the incident— were assigned to the control booth at J1 3-South. As control booth operators, they were responsible for observing three cell blocks on 3-South: 3A, 3B, and 3C. Fitts and Campbell state that they took their lunch break from 12:00 p.m. to 1:00 p.m., but jail logs reflect Officer Timothy McLoyd relieved Campbell at the control booth around 12:25 p.m., where she remained for approximately another five minutes to make an entry on the log indicating that at 12:30 p.m. the cellblock was on lockdown with the televisions and telephones turned off. During the cool down period, the door to the cellblocks are closed and the lights are dimmed. Docs. 19-4, 19-5 & 28-3.

Officer McLoyd offers testimony that the control booth on 3-South has two video screens which allow the booth operator to observe activity in the cellblocks. Control booth operators can also hear sound from the cellblock. Officers may not leave the control booth

unoccupied unless they are relieved by another officer or they are assisting in the feeding process or the provision of medical attention. During the time he was in the control booth on May 14, 2015, Officer McLoyd observed no unusual activity, nor did he observe any inmates entering Davis' cell at the beginning of the cool down period that began at 12:30 p.m. Doc. 28-3; *see also* Docs. 19-4 & 19-5.

Sergeant Marcus Townsend was the J-1 Supervisor on May 14, 2015, and as part of his normal duties in this position he temporarily relieved a Central Control Booth ("CCB") operator for a break. Townsend testifies the CCB is on the first floor of the Montgomery County Detention Facility, and the CCB operator is in charge of electronically locking and unlocking doors in the facility to allow the ingress and egress of inmates, staff, and visitors. The CCB has approximately eight to ten monitors where the CCB operator can observe various parts of the detention facility including the isolation cells, the front lobby and back of the facility, and various locations in the cellblocks on Floors 2, 3, and 4. The video screens are observed by the control booth operator during his or her shift. Townsend testifies he did not observe any altercation involving Davis or any unusual activity on the screens in the CCB—including any inmates entering Davis' cell—at the beginning of the cool down period. Doc. 28-2.

Following an hour-long lunch break, Defendants Campbell and Fitts returned to the control booth on J1 3-South at approximately 1:30 p.m. Officer McLoyd returned to his rover duties at the facility. Defendants Campbell and Fitts remained in the control booth for the next hour, during which they maintain they did not hear or observe any activity involving Davis. At approximately 2:37 p.m. Campbell entered the cell block to turn on the television by remote control. While standing in the dayroom, Campbell heard a loud

noise and a voice call out "help me," at which time she directed the inmates in the cellblock to lock down. After radioing Central Control about a possible inmate altercation in 3C cellblock, Campbell approached 3C-5 cell and saw three inmates in the cell with Davis, who looked as if he had been assaulted. The three inmates complied with Campbell's directives to get down on their knees. Campbell then ordered Fitts to open the cell door so Davis could be removed and escorted to the vestibule area of the cellblock. A nurse arrived at 3-South at approximately 2:50 p.m. and within a few minutes Davis was escorted to the medical unit. Medical personnel examined and treated Davis and advised jail staff that he needed to be transported for treatment. Because Davis was in the custody of the Alabama Department of Corrections, jail officials informed medical personnel he would have to be transported to Kilby for further medical care. Docs. 19-2, 19-4, 19-5, 27 (video attachment), 28-1, 28-2 & 28-3.

Defendants' video evidence corroborates their sworn affidavits. This evidence reflects that, before the cool down period, inmates can be seen walking around the dayroom room area and going in and out of cells. At approximately 12:21 p.m. an inmate can be seen walking up the stairs of the cell block and entering a cell at the top of the stairs with three inmates following inside behind him. Approximately nine minutes later, an inmate walks up the stairs, enters the same cell, and another inmate can be seen leaving. The video evidence of the control booth during this time period shows Fitts and Campbell seated at computer monitors and occasionally standing up and walking to different parts of the control booth. At 12:24 p.m., the lights in the cell block appear to dim and Officer McLoyd is seen entering the control booth. Campbell and Fitts return to the control booth at 1:27 p.m. When the cool down period ended at 2:34 p.m., inmates resumed movements around

both floors of the cellblock. Campbell enters the day room at 2:37 p.m. and is observed quickly going up the stairs to Davis' cell and removing him from inside. Doc. 27-1.

Regarding Davis' allegation that he informed jail staff "many times" that he had enemies on the third floor but they still housed him there (*see* Docs. 1 & 38), Defendants state that when Davis was booked into the facility on February 4, 2015 he signed a form affirming that to his knowledge he had no enemies at the facility and did not seek to be placed in protective custody. Doc. 46 at 8. Defendants further affirm that Davis' inmate file contains no updated enemy lists between February 4, 2015 and May 14, 2015.[5] *See* Docs. 61 & 62. On the day the incident occurred, the facility shift log shows Davis was relocated from cell J1-4B-02 to J1-3C-05 at 10:14 a.m. Doc. 28-3 at 5. After being relocated, there is no evidence Davis voiced any complaints or concerns to any defendant or other correctional officer regarding enemies in cell block 3-South or that he feared harm from any inmate on that cell block prior to the May 14, 2015 incident.[6] Doc. 46.

There is no probative evidence before the court of "an objectively substantial serious risk of harm" posed by any inmate to Davis prior to the attack that would establish deliberate indifference. *Marsh*, 268 F.3d at 1028–29. The evidentiary materials submitted by Defendants refute Davis' allegations that they acted with deliberate indifference to his

---

[5] Although Defendant Campbell testifies that she remembers that Davis was relocated to J1 3-South from J1 3-North because he claimed to have enemies in that cell block (*see* Doc. 19-5 at 1), the record does not reflect when that move occurred or that Davis identified any particular inmate as an enemy. Notwithstanding Davis' statement to correctional officers that he had enemies in J1 3-North, there is no evidence he advised Defendants or other jail staff of any concerns regarding an enemy situation when he was moved to the new cell block in 3-South.

[6] Of particular note from the shift log made on May 14, 2015, is an entry showing that at 2:55 p.m. a new inmate named Tony Hooks arrived. Doc. 28-3 at 6. He was placed in cell 3A-10. *Id.* A subsequent entry made the same day at 6:45 p.m. shows "Hooks, Tony 3A-10 . . . informs Ofc. Thrift he has enemies in A-pod. Ofc. Thrift informs Sgt. Williams." *Id.* at 7.

safety.  While Davis argues that he informed "jail staff" he had enemies on the third floor, implying that this put the named defendants on notice that an attack was possible, there is no evidence any defendant actually knew of any risk to Davis from his inmate attackers. *Carter*, 352 F.3d at 1350 ("[T]here must be much more than mere awareness of [a] generally problematic nature [of another inmate because a] generalized awareness of risk . . . does not satisfy the subjective awareness requirement."); *see also Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996) ("[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.").  There is no indication from the pleadings and evidence before the court that Davis at any time identified the inmates who attacked him as enemies or that any defendant or other correctional personnel knew of any prior run-ins or problems between the four inmates. The record is devoid of evidence Davis informed any Defendant he feared a risk of attack by any inmate who attacked him on May 14, 2015.

Even if Davis had satisfied the objective component of his deliberate indifference claim, the court does not find any act or omission of Defendants or any other correctional official knowingly exposed Davis to a substantial risk of serious harm.  No evidence has been presented that any defendant was "aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exist[ed]" to Davis and they ignored the risk, and "merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Carter*, 352 F.3d at 1349–50 (quotations and alteration omitted).  When Campbell heard Davis' request for help, she quickly went to his aid and removed him from the cell.  On this record, the court finds Davis fails to establish the subjective component of his deliberate indifference claim because he has not shown that

any defendant subjectively knew of a risk of harm to him posed by his inmate attackers. *Johnson v. Boyd*, 568 F. App'x 719, 722 (11th Cir. 2014) (finding complaint properly dismissed for failure to state a claim because "[n]owhere does the complaint allege, nor can it be plausibly inferred, that the defendants subjectively foresaw or knew of a substantial risk of injury posed by [inmate-attacker]"); *Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005) (finding where allegations simply implied that prison officials should have known that inmate-attacker posed a threat to others due to past behavior and general verbal threats, defendants were entitled to summary judgment because Plaintiff provided no evidence that prison officials "had subjective knowledge of the risk of serious harm presented by [fellow inmate]" and "introduced no evidence indicating that he notified [the defendants] of any particularized threat by [his attacker] nor of any fear [he] felt"); *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) ("[B]ecause [Plaintiff] alleged no facts indicating that any officer was aware of a substantial risk of serious harm to him from [his attacker] and failed to take protective measures, his [failure to protect] claim fails."); *see also Brown*, 894 F.2d at 1537 ("[N]egligent failure to protect an inmate from attack does not justify liability under § 1983."); *Staley v. Owens*, 367 F. App'x 102, 108 (11th Cir. 2010) (finding inmate plaintiff failed to demonstrate supervisory liability because the mere fact that isolated inmate assaults may have occurred over several years "is not sufficient to establish that there was a history of widespread abuses that supervisors failed to reasonably respond to"); *Harrison v. Culliver*, 746 F.3d 1288, 1300 (11th Cir. 2014) (finding that although increasing the number of officers in an area of the facility "may have improved security, [the warden's] decision not to do so did not create a

substantial risk of harm).  In light of the foregoing, Defendants are entitled to qualified immunity on Davis' claim that they acted with deliberate indifference to his safety.

## G.  Failure to Intervene

To the extent Davis complains Defendants failed to conduct the normal security checks in the area of the attack on the day of the incident, preventing a correctional officer from intervening to end the attack, this claim entitles him to no relief as liability attaches only if a defendant was in a position to intervene in the altercation.  The undisputed evidence reflects that Montgomery County Detention Center policy directed for inmate head counts to be conducted at the beginning of each of the three shifts, during which officers must order all inmates to report to their bunks before entering the cellblocks.  Cellblocks also are monitored during each shift by officers in the control booths with camera screens in the booth and the ability to listen via intercom to what is going on in the cellblock.  Correctional staff also perform observation checks during the shifts.  All correctional officers are trained regarding these procedures.  Additionally, during the cool down period—which was not the start of a new shift—inmates are required to be in their cells, with the doors closed, and the lights are dimmed.  As explained, no defendants or other jail personnel observed or heard any unusual activity involving Davis during the cool down period.  Defendants also state that prior to the incident with Davis on May 14, 2015 the facility had experienced no problems with assaults or harm occurring to inmates during the cool down period.[7]

As explained above, "[p]rison correctional officers may be held directly liable under

---

[7] As of December 1, 2015, Defendants state the cool down period is no longer utilized. Doc. 19-2.

§ 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence . . . However, in order for liability to attach, the officer must have been in a position to intervene." *Terry*, 376 F. App'x at 896. "An officer who fails to intervene in a fight between inmates can only be held liable if he was physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff." *Seals v. Marcus*, 2013 WL 656873, at *7 (M.D. Ga. 2013) (internal citation and quotations marks omitted). Davis' contention that a security check did not take place in his cellblock on the day the incident occurred is insufficient, on this record, to demonstrate that any defendant or other correctional officer was in a position to intervene and failed to do so. Because Davis fails to allege, much less prove, that any defendant was in a position to intervene and act in time to stop his attack, Defendants are entitled to qualified immunity.[8]

## H. Failure to Train and Supervise

Davis complains that the defendant supervisory officials' failure to train and supervise their subordinates resulted in the alleged constitutional violations. Davis does not allege Sheriff Cunningham or Director Robinson were involved with the actions about which he complains, but nevertheless seeks to hold them accountable because they allegedly failed to properly train and supervise their correctional officers. Doc. 1 & 38. However, "under § 1983, a supervisor can be held liable for failing to train his or her employees 'only where the failure to train amounts to deliberate indifference to the rights

---

[8] The court has liberally construed the complaint to contain a "failure to intervene claim" and addressed this contention in accordance with various panel opinions of the Eleventh Circuit which rely on *Ensley* to dispose of this type of claim. The court is aware that the Eleventh Circuit in Johnson, 568 F. App'x at 722 n.2, noted that "[w]hile it is well settled that *Ensley* applies to situations where one officer observes a fellow officer violating a constitutional right, typically by using excessive force, we have not explicitly adopted this holding in a situation involving an officer observing a fight between inmates."

of persons with whom the [officers] come into contact.'" *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *Thomas v. Poveda*, 518 F. App'x 614, 618 (11th Cir. 2013) (citing *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397 (11th Cir. 1994)).

Davis must allege that Cunningham and Robinson had actual or constructive notice that a deficiency in their training or supervision caused their employees to violate his constitutional rights. *Thomas*, 518 F. App'x at 618. Davis contends that the actions of Cunningham's and Robinson's subordinates are his evidence that they were improperly trained and supervised. This is insufficient. To establish deliberate indifference, Davis must show that Cunningham and Robinson were "aware of the need to train or supervise [their] employees in a particular area." *Am. Fed. of Labor & Congress of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1189 (11th Cir. 2011). This is ordinarily demonstrated by evidence reflecting that supervisory personnel were aware of "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). An allegation of a single violation does not establish liability. *Id.*; *Keith*, 749 F.3d at 1053.

Here, Davis merely alleges the ultimate conclusion that Cunningham and Robinson failed to train and supervise subordinate officers without showing they knew of events that would have put them on notice of a specific need for training or supervision. Cunningham and Robinson are, therefore, entitled to qualified immunity on Davis' failure to train and supervise claim.

## I.    Respondeat Superior

To the extent Davis names Cunningham and Robinson as defendants based on their

supervisory positions, supervisory personnel cannot be liable under § 1983 for a constitutional violation committed by one of their subordinates via a theory of *respondeat superior* or based on vicarious liability. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691–95 (1978) (holding that doctrine of *respondeat superior* is inapplicable to § 1983 actions); *Belcher*, 30 F.3d at 1396 (noting that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of *respondeat superior* or vicarious liability); *see also Cottone*, 326 F.3d at 1360 (holding that a supervisory official is liable only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions . . . and the alleged constitutional deprivation"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996) ("[A] prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*; the official must actually have participated in the constitutional wrongdoing."). Thus, Sheriff Cunningham and Director Robinson are liable for the challenged conduct of their subordinates only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation[s]." *Cottone*, 326 F.3d at 1360 (citation omitted).

Cunningham and Robinson were not present when Davis was assaulted in his cell by three unknown inmates, so they did not personally participate in any allegedly unconstitutional conduct. Therefore, these defendants may be held liable only if their actions bear a causal relationship to the purported violation of Davis' constitutional rights. To establish the requisite causal connection and avoid entry of summary judgment in favor of these defendants, Davis must present sufficient evidence of either "a history of

widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation," which they failed to act on, a "custom or policy [that] result[ed] in deliberate indifference to constitutional rights," or facts that "support an inference that [they] directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  A thorough review of the record demonstrates Davis has failed to meet this burden.

Davis has presented no probative evidence of obvious, flagrant, or rampant abuse of continuing duration in the face of which Cunningham and Robinson failed to take corrective action.  While Davis generally contends that the inmate attack on him resulted from the supervisory defendants' alleged policy of failing to provide adequate security and training, he presents no evidence—substantially probative or otherwise—that the challenged inmate attack was the proximate result of these alleged deficiencies.  Davis' conclusory assertions, without more, are insufficient to establish the requisite causal connection.  No evidence in the record indicates that a policy enacted by the supervisory defendants or a lack of supervision or training contributed to the alleged unconstitutional conduct.  Thus, Davis has failed to establish liability under the custom or policy standard. *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877 (1990).  Consequently, neither method of establishing liability under the causal relationship test provides a basis for liability under § 1983.  Cunningham and Robinson are entitled to qualified immunity on Davis' *respondeat superior* claim.

A separate judgment shall be entered.

DONE on this 5th day of March, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE